**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** **Plaintiff,** | |
| **vs.** | **CASE NO. 2:24-CR-163** |
| **KEITH DAVENPORT, III,** **aka Keefy,** | **CHIEF JUDGE SARAH D. MORRISON** |
| **Defendant.** | |

## SENTENCING MEMORANDUM OF THE UNITED STATES

Keith Davenport, III, aka Keefy, was the leader of a large-scale gun trafficking operation. He led the execution of a scheme that put peoples' lives in danger by trafficking guns to people who should not have them. Without him, none of this would have happened. He has a criminal history that shows he is on a dangerous path toward more fraud, guns, and violence. For these reasons, and those below, the United States recommends that the Court impose a term of incarceration of 84 months, a term of supervised release of three years, and restitution in the amount of $12,344.16.

### I.     BACKGROUND

In July of 2022, ATF began investigating a series of suspicious gun purchases. The investigation indicated that a number of defendants engaged in a conspiracy to purchase firearms online using stolen credit card information, ship them to FFLs in central Ohio, and then obtain the firearms (often for re-sale). More specifically, once the firearms were transferred to the Southern District of Ohio, the co-conspirator whose name was on the purchase (as the online purchaser) would go into the FFL, falsely fill out the ATF Form 4473 (by indicating that they were the actual buyer of the firearm), and then obtain the firearm for further dissemination.

For his part, the Defendant, Keith Davenport, III, aka Keefy, was the leader of the entire conspiracy. In that position, he obtained the stolen credit card information, ordered the firearms online, recruited co-conspirators to engage in the straw purchase of those firearms, and then helped arrange for re-sale of the firearms on the back end. Essentially all of the evidence in the case, including Davenport's own text messages from his own cell phone, proved this scheme.

On October 30, 2024, Davenport and others were indicted in a multi-count charging instrument. Davenport was charged in Count 1 with conspiracy, in violation of 18 U.S.C. § 371, and in Counts 2–13 with making a false statement in the acquisition of a firearm, in violation of 18 U.S.C. §§ 922(a)(6), 924(a)(2), and 2. The defendant was also charged in Count 14 with aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1) and 2. That charge carries with it a mandatory-minimum term of imprisonment of 2 years, required to be served consecutively with any other sentence imposed in this case. On April 22, 2025, the defendant pled guilty to Count 1 (the conspiracy count) and Count 14 (the aggravated identity fraud count). On July 14, 2025, the Probation Officer released Davenport's Final PSR.

Sentencing in this matter is set for September 22, 2025, at 12:30 p.m.

## II.       GUIDELINES RANGE/PRESENTENCE INVESTIGATION REPORT

The PSR calculated the following:

- A base offense level of 14, per U.S.S.G. § 2K2.1(a)(6);
- An increase of 10, per *id.* § 2K2.1(b)(1)(E), because the offense involved more than 200 firearms;
- An increase of 2, per *id.* § 2K2.1(b)(4)(A), because one of the firearms was stolen;
- An increase of 4, per *id.* § 2K2.1(b)(5), because the defendant engaged in firearms trafficking;

2

- An increase of 4, per *id.* § 3B1.1(a), because the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive; and
- Minus 3 for acceptance.

The resulting offense level came to a 31, with a criminal history of I, which yielded an initial sentencing range of 108–135 months.

There are no outstanding objections, though the government makes two notes. First, the PSR applies a 10-level enhancement because the conspiracy involved 200 or more firearms. While the facts laid out in the PSR are accurate, the government intends to honor its plea agreement with the defendant. To that end, in a negotiated resolution, the parties agreed to a 6-point guideline enhancement for the number of firearms at play. In addition, the PSR applied a 4-point enhancement for the defendant's status as an organizer or leader of the criminal activity. In the plea agreement, the parties agreed to a 3-point role enhancement for the defendant's status as a manager or supervisor of the illegal activity.

Based on the above, if the Court were to honor the parties' agreement, the resulting offense level would look like this:

- A base offense level of 14, per U.S.S.G. § 2K2.1(a)(6);
- An increase of 6, per *id.* § 2K2.1(b)(1)(C), because of the number of firearms;
- An increase of 2, per *id.* § 2K2.1(b)(4)(A), because one of the firearms was stolen;
- An increase of 4, per *id.* § 2K2.1(b)(5), because the defendant engaged in firearms trafficking;
- An increase of 3, per *id.* § 3B1.1(a), for a manager enhancement; and
- Minus 3 for acceptance.

The total offense level, after acceptance, would be 26. With a CH of I, the resulting range would be 63–78 months as to Count 1, to be followed with a mandatory two-year sentence on Count 14. The statutory maximum as to Count 1 is 60 months' incarceration.

3

### III.   ANALYSIS AND RECOMMENDATION OF THE UNITED STATES

Sentencing requires a determination of the applicable Guideline range, whether a departure is appropriate, and a consideration of the factors in 18 U.S.C. § 3553(a). *See Gall v. United States*, 552 U.S. 38, 49–50 (2007). Under this analysis, the government submits for the reasons below that a total term of incarceration of 84 months—60 months (the statutory maximum, which is below the negotiated guideline range and well below the correctly calculated guideline range in the PSR) on Count 1, plus the mandatory 24 months on Count 2—is fair.

### A. Nature and Circumstances: Gun Trafficking Is a Serious Crime that Puts Lives in Danger

#### 1.  Large-Scale Gun Trafficking Is Serious

A single straw purchase or illegal transfer of a firearm is "a callous and extreme risk to public safety." *United States v. Daniells*, No. 15-10150, 2017 WL 2256988, at *4 (D. Mass. May 23, 2017). The illegal transfer of a firearm is a callous and dangerous act because guns are inherently dangerous, and guns in the hands of people who shouldn't have them is even more dangerous. It is a callous and dangerous act because it skirts the regulatory framework in place to track and monitor the sale and re-sale of dangerous guns. *See United States v. Arzu*, No. 5:07 CR 166, 2007 WL 2713908, at *3 (N.D. Ohio Sept. 17, 2007) (noting that "[t]he access to firearms through illegal channels is a problem for law enforcement of immense p[ro]portions," which, in part, justifies "a sentence at the highest level of the advisory Guidelines range"). And it is a callous and dangerous act because it entails a fundamental lack of care about what happens with the guns afterwards—or to the people they hurt or even kill.

The circumstances of this case are aggravated beyond a run-of-the-mill straw purchase or illegal transfer.

First, there wasn't just one straw purchase or transfer of a gun to someone who shouldn't have it.  That would be dangerous enough.  But here, the defendant was one of the leaders of a conspiracy in which well more than 50 guns were transferred to people who shouldn't have them.  The defendant's conduct therefore significantly amplified the potential danger of an illegal firearms transfer.  *See United States v. Elsaddique*, 252 F. App'x 992, 993 (11th Cir. 2007) ("[The defendant] used a false name to purchase three firearms.  The act alone creates a significant danger to the public, which is only increased by the possibility that he made the purchase on someone else's behalf—someone who may have had a more serious and more recent criminal history.").

His conduct also put people's lives in danger.  This is not speculation.  It is reality.  Every year, innocent people who have no connection to illegal firearms are killed because of the callous act of gun trafficking.[1]  We are lucky that no one has died because of the defendant's conduct in this case—yet—*that we know of.*  And even though no one has been hurt or injured—yet—*that we know of* by the defendant's conduct, his actions have already put people's lives in danger.

We know that guns kill and maim, and we know guns from this scheme ended up in the wrong hands.  One of the guns was found shortly after purchase when CPD SWAT executed a search warrant in Columbus at a location related to suspected narcotics trafficking—and found the

---

[1] For example, in 2018, two Westerville police officers were shot and killed by an individual who received a gun he shouldn't have from one of his friends. *See* https://www.dispatch.com/news/20181018/man-gets-5-years-for-providing-gun-used-to-kill-2-westerville-police-officers ("Elizabeth Morelli remembered her father, Westerville Police Officer Anthony Morelli, as kind and caring and as someone who 'always went above and beyond for everyone.'  Her dad had two goals: walking her down the aisle at her wedding and spending time with his future grandkids.  A tearful Elizabeth Morelli stood before a crowded federal courtroom Thursday in Columbus, recounting her wedding ceremony earlier this year without her dad, who was fatally shot Feb. 10 while responding to a domestic disturbance call.").

firearm along with suspected narcotics.  One of the handguns was found on an individual not in America legally in the context of a traffic stop in 2022.

The circumstances show that these guns were not trafficked by accident to people who didn't know what to do with them.  They were specifically trafficked to individuals who should not have had them—including a drug dealer.  The government submits that these are aggravating factors that support its requested sentence of 84 months, which is below the negotiated guideline range and well below the guideline range in the PSR.

Another aggravating factor in this case is the use of stolen credit card information, which also takes this case out of the rubric of the run-of-the-mill gun trafficking scheme.  Here, Davenport obtained stolen credit card information and then used those stolen cards to get the guns.  The harm he caused, in other words, stretched beyond just the gun trafficking scheme, and spread to innocent people in the community who didn't voluntarily lend their financial information to be used in illegal gun purchases.

Finally, the defendant engaged in this behavior again and again, over a long period of time. He had time to quit or to stop, but he didn't.  He woke up time and time again and did it again and again.  Moreover, this was a deliberate choice.  This isn't the sort of case where the defendant took the steps he did while driving or while going to the gym or while talking to other people.  He deliberately sat down, committed complicated crimes that endanger our community and then did it again a few days later and again a few days later and again a few days later.  He did it for months.

These factors counsel in favor of a serious sentence.

6

**2.   The Defendant Was in Charge, and He Should Be Sentenced Accordingly.**

The defendant's role in this case is an aggravating factor.  The defendant is the one who concocted this entire scheme.  He is the one who obtained the stolen credit card information.  He is the one who then hatched the plan to purchase the firearms online under the name of the straw purchaser.  He is the one who then recruited the straw purchaser(s) to execute his plan.  He is the one who assisted with lining up the sale of the straw-purchased firearm on the back end.  He is the one who was caught with one of Javohn Garcia's guns *the same day it was purchased by Garcia*, in a traffic stop where law enforcement also found a credit card skimmer, multiple fraudulent/stolen credit cards, and three of the firearms at issue in this conspiracy.  (Ex. A ¶¶ 18–19.)

The defendant engaged in dangerous behavior by skirting the congressional framework aimed at limiting guns falling into the wrong hands.  He did so knowing how dangerous it was.  And he did so as the leader of the entire conspiracy.  The government respectfully submits that a sentence of 84 months is appropriate given the serious nature of the conduct at issue, and given the aggravating factors present.

**B.  History and Characteristics**

The defendant's history and characteristics do him no favors.  At first glance, he might seem to be light on prior run-ins with the law.  A closer look tells another story: Even though he did not score high on criminal history points, he is on the wrong trajectory.

For example, this is not his first rodeo when it comes to fraudulent activities.  When he was almost 18, he used a credit card in someone else's name to book a hotel room.  Less than two months later, he "participated in identity fraud by obtaining personal identifiers of others to include

7

stolen mail, checks, identities, apartments leased using false information, and vehicles purchased with identities of other unsuspecting victims." (PSR ¶ 72.) He then was found in a stolen Dodge Charger, during which time a pistol was found in a search of the vehicle—a subsequent search then turned up a magazine for the firearm in Davenport's own room.

He also has two pending charges. Both are serious, and both pertain to him trying to break into a post office in northern Ohio. After he was arrested for criminal damaging and trespass for trying to break into the post office, he allegedly assaulted two police officers and a hospital security officer. A capias for failure to appear has been issued in that case, likely because Davenport's bond was revoked in the instant matter shortly before a hearing in that case.

That is not his only prior charge related to violence. In January of this year, the defendant was charged with domestic violence and assault. A bond violation report was issued for his new charges, and the parties came before Judge Jolson for a show cause hearing as to why the defendant's bond should not be revoked. As part of his charges, Worthington police issued a report, which included the following:

> On 01/17/2025 . . . officers were dispatched to [an address in their jurisdiction] in reference to domestic violence. Upon [their] arrival, [an officer] spoke to the victim . . . . [The victim] stated she was picked up by her boyfriend (Keith Davenport) from her mom's house. She stated that he was about to drive her to his house; however, during the trip, he took her phone from her hand and checked it. [The victim] asked Mr. Davenport to return her phone; however, Mr. Davenport started punching her while driving. Mr. Davenport pulled over to the location, parked his car, and started punching [the victim] with both hands. [The victim] stated she wanted to call the police; however, Mr. Davenport grabbed her phone, smashed it into the ground, and threw it onto the roof of [the address where they stopped]. [The victim] had multiple bruises and red marks on her right cheek. She also had a bump on the left side of her head.

(Ex. B.)

8

The defendant might respond that the charges stemming from him beating his girlfriend were dropped.  Of course, many such charges ultimately get dropped because the victim decides not to cooperate, which is what happened here.  While that might be enough to evade a formal charge, that doesn't mean it didn't happen.  To that end, the above information associated with the charges was presented to Judge Jolson in a hearing, in open court.  Judge Jolson was moved enough to find them credible, in part because of corroborating information documenting the facts at play— the bruises and red marks on the victim's cheek, and the fact that the phone at issue was indeed found on the roof of the address cited in the report.  Even more, at the bond revocation hearing related to the domestic violence charge, the defense called the victim as a fact witness.  Despite the victim minimizing the offenses committed by Davenport, Judge Jolson saw the reality—that victims in domestic violence situations often recant—and appreciated the danger that Davenport posed to the community and thus decided to revoke his bond.

The government's view of the trendline laid out above is that it is not good.  Again, his criminal history score does not, at first glance, connote anything too serious.  But a closer look indicates that Davenport has prior extensive experience with fraud, guns, and violence.  The sentences, such as they were, he has received so far have failed to deter the defendant from criminal activity.

The government respectfully urges that the proper sentence, to this end, is 84 months' incarceration.

## C. Unwarranted Sentencing Disparities: The Defendant Was at the Top of the Conspiracy.

This is a large firearms-trafficking crime, with guns that ended up in the hands of people who should not have had them.  This case involved a large number of firearms.  The other five

defendants have already pled guilty, and several have been sentenced.  This is the most serious defendant the Court will sentence in this case.  He was at the top of the conspiracy.  The circumstances indicate that he was in charge, made the connections for re-sale, and stood to benefit the most from the conspiracy.  He should be sentenced accordingly.

### IV.     CONCLUSION

The defendant knowingly stole victims' credit card information and then oversaw the trafficking of a large number of firearms into the hands of people who shouldn't have them.  This is a serious offense, and the full toll of the defendant's actions on society won't be known for many years to come.  These circumstances underscore why crimes like this have been described as callous—the defendant did all of this without caring what happened to potential victims of gun violence.  The defendant's history and characteristics show that this was not a fluke.  He is on a dangerous trajectory of committing more crimes to the detriment of the community.  His actions before, during, and after the conspiracy call for a serious sentence.  He behaves dangerously without regard to the people around him, and his sentence should reflect as much.

For these reasons, the government submits that a term of incarceration of 84 months, $12,344.16 in restitution as listed in the PSR, a term of supervised release of three years, and a $200 special assessment would be sufficient but not greater than necessary to further the ends of sentencing.

Respectfully submitted,

DOMINICK S. GERACE II
United States Attorney


*s/S. Courter Shimeall*
S. COURTER SHIMEALL

10

DAMOUN DELAVIZ
Assistant United States Attorneys
303 Marconi Boulevard, Suite 200
Columbus, Ohio 43215
Office: (614) 469-5715
Fax: (614) 469-5653

11

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Sentencing Memorandum of the United States was served this 8th day of September, 2025, electronically upon all counsel of record for defendant Keith Davenport, III, aka Keefy.

*s/ S. Courter Shimeall*
S. COURTER SHIMEALL (OH 0090514)
Assistant United States Attorney